IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 08-cv-2744-WDM-BNB

CENTER FOR NATIVE ECOSYSTEMS,
SOUTHERN UTAH WILDERNESS ALLIANCE,
UTAH NATIVE PLANT SOCIETY, and
COLORADO NATIVE PLANT SOCIETY

       Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE and
KEN SALAZAR, in his official capacity as Secretary of the
United States Department of the Interior,

       Defendants.

_____

**ORDER**

_____

Miller, J.

       This case comes before me on the Petition for Review of Agency Action (ECF

No. 31) filed by Plaintiffs Center for Native Ecosystems, Southern Utah Wilderness

Alliance, and Utah Native Plant Society (collectively "Plaintiffs").  The petition challenges

the decision of the United States Fish and Wildlife Service ("FWS") and Ken Salazar, in

his official capacity as Secretary of the United States Department of the Interior, [1] to

withdraw the proposed listing of Graham's penstemon (*Penstemon grahamii, p.*

*grahamii*), a wildflower native to Colorado and Utah, as a threatened species under the

Endangered Species Act ("ESA").  *See* Endangered and Threatened Wildlife and

_____

[1]  The Secretary of the Interior has delegated his authority to administer the Endangered
Species Act to the FWS.  *See* 50 C.F.R. § 402.01(b).  Accordingly, I shall refer to
Defendants as "FWS" throughout this order.

Plants; Withdrawal of Proposed Rule to List Penstemon grahamii (Graham's beardtongue) as Threatened with Critical Habitat, 71 Fed. Reg. 76024-35 (Dec. 19, 2006) (Administrative Record "AR" at 118-130) ("Final Rule").  Plaintiffs assert that this Final Rule violates the ESA for three reasons: (1) FWS failed to consider the combined impact of the identified threats to the plants; (2) FWS disregarded the best available information regarding the threat to the plant of oil and gas development, livestock grazing, and off-road vehicles ("ORVs"); and (3) FWS failed to demonstrate how claimed conservation measures to protect the plant were implemented and effective and improperly relied on future measures. *See* Plaintiffs' Reply Brief (ECF No. 34).

In response, FWS contends that the administrative record for the challenged Final Rule shows that FWS addressed the possible threats and determined that they did not currently threaten the species throughout all or a significant portion of its range and were unlikely to do so in the foreseeable future.  FWS argues that it rationally concluded, based on its review of the totality of the administrative record, that these possible threats did not warrant listing the species under the ESA.

Having reviewed the parties' pleadings and briefs and heard oral argument, I am fully advised in the premises.  For the reasons set forth below, I shall grant Plaintiffs' Petition.

<u>STANDARD OF REVIEW</u>

Judicial review in this case is governed by the Administrative Procedure Act ("APA") which limits review to whether the agency, here FWS, acted in a manner that was "arbitrary, capricious an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

2

402, 413-414 (1971).  An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  I should review the agency's decision-making process to determine whether "the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994).

An agency's decision is entitled to a "presumption of validity" and the burden of proof rests upon the party who challenges such action.  *Citizens' Comm. to Save our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).  However, the agency action can only be upheld "on the basis articulated by the agency" during the decision-making process, *Motor Vehicle Mfr. Ass'n ,* 463 U.S. at 50, and an after-the-fact rationalization cannot be used to cure non-compliance by the agency.  *Olenhouse*, 42 F.3d at 1575.  The agency's conclusions must be supported by substantial evidence in the record.  *Utah Envtl.Cong. v. Bosworth*, 372 F.3d 1219, 1223 (10th Cir. 2004).

My review is limited to the administrative record before the agency at the time the FWS decision was made.  5 U.S.C. § 706.  Indeed, my review should be processed as an appeal based on the appellate record and I should not rely on evidence outside that record.  *Olenhouse*, 42 F.3d at 1579-80.

**BACKGROUND**

1.    The Endangered Species Act

The ESA was enacted by Congress "to provide a means whereby the
ecosystems upon which endangered species and threatened species depend may be
conserved, [and] to provide a program for the conservation of such endangered species
and threatened species." [2]  16 U.S.C. § 1531(b).  Specifically, the ESA directs the
Secretaries of the Interior and Commerce to determine whether a particular species
should be listed as "endangered" or "threatened."  16 U.S.C. § 1533.  Listed species are
protected by the ESA, which also authorizes the Secretary to issue regulations "as . . .
necessary and advisable" for the conservation of such listed species.  16 U.S.C. §
1533(d); *see also, Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (stating, "the Act
specifically defined 'conserve' as meaning 'to use and the use of *all methods and
procedures which are necessary* to bring *any endangered species or threatened
species* to the point at which the measures provided pursuant to this chapter are no
longer necessary.'" *Id.* (quoting 16 U.S.C. § 1532(2)) (emphasis provided in *Tenn.
Valley Auth.*)).  Congress required FWS to protect threatened as well as endangered
species to ensure that FWS would "take preventive measures *before* a species is
'conclusively' headed for extinction."  *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670,
680 (D.D.C. 1997) (emphasis in original).

The ESA sets forth five factors that must be considered in a listing determination:

---

[2]  The ESA defines an "endangered" species as "in danger of extinction throughout
all or a significant portion of its range," 16 U.S.C. § 1532(6), whereas a "threatened"
species is "likely to become an endangered species within the foreseeable future
throughout all or a significant portion of its range."  *Id.* § 1532(20).

(1) the present or threatened destruction, modification, or curtailment of the species'
habitat or range; (2) overutilization for commercial, recreational, scientific, or
educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory
mechanisms; and (5) other natural or manmade factors affecting its continued
existence.  16 U.S.C. § 1533(a)(1)(A–E); 50 C.F.R. § 424.11(c)(1–5).

Based on this five-factor analysis, the FWS must determine whether a species is
endangered or threatened, *i.e.*, in danger of extinction, throughout all or a significant
portion of its range, or likely to become so in the foreseeable future.  16 U.S.C. §
1532(6) and (20).  Listing a species is appropriate if the five-factor analysis establishes
that any one or combination of these possible threats rises to a threshold level sufficient
to trigger threatened or endangered status. 16 U.S.C. § 1533(1) ("The Secretary shall . .
. determine whether any species is an endangered species or threatened species
because of any of the following [five] factors.")

The ESA sets forth no formula for assigning relative importance to the five
factors.  Instead, determining whether listing a species is warranted by one or more of
the five factors and the significance of those factors as applied to a species' particular
circumstances is left to the FWS's informed discretion.  *See Kleppe v. Sierra Club*, 427
U.S. 390, 412 (1976).  This listing determination, however, must be based "solely on the
basis of the best scientific and commercial data available to [it] after conducting a
review of the status of the species."  16 U.S.C. § 1533(b)(1)(A).  The FWS must also
"tak[e] into account those efforts, if any, being made by a State or foreign nation, [or]
any political subdivision of a State or foreign nation, to protect such species, whether by
predator control, protection of habitat and food supply, or other conservation practices."

*Id.*

The ESA permits any interested person to petition FWS to list or delist a

particular species.  16 U.S.C. § 1533(b)(3).  Upon receipt of a petition, FWS must,

> [t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted.

16 U.S.C. § 1533(b)(3)(A); *see also,* 50 C.F.R. § 424.14(b)(1).  If the Secretary

determines that the petition presents substantial information to indicate that listing the

species may be warranted, the Secretary, acting through the FWS, must commence a

status review (16 U.S.C. § 1533(b)(3)(A)), which requires it to collect and analyze the

"best scientific and commercial data available" for the species.  *Id.*  Upon completion of

the status review, the FWS must issue one of the following findings: (1) the petitioned

action is not warranted; (2) the petitioned action is warranted (requiring the publication

of proposed and final rules to list the species); or (3) the petitioned action is warranted,

but promulgation of proposed and final rules to list the species is precluded by pending

proposals to list other species.  16 U.S.C. § 1533(b)(3)(B).  Any proposed or final rules

are subject to the notice-and-comment provisions set forth in the APA.  5 U.S.C. § 553;

16 U.S.C. § 1533(b)(4).

     2.   <u>Species at Issue.</u>

Graham's penstemon ("Penstemon") is an herbaceous perennial plant that

occurs uniquely on exposed, raw shale knolls and slopes in western Colorado and

eastern Utah.  There are five core populations of the Penstemon, stretched out in a half circle across the southern end of the Uintah Basin in northeastern Utah and northwestern Colorado.  Four populations are in Utah; one is in Colorado.  71 Fed. Reg. 76024, 76024–25 (Dec. 19, 2006) (AR 119–120).[3]  These core populations include approximately 6,200 plants.  *Id.*  Sixty percent of the Penstemon population lives on federal public lands managed by the U.S. Bureau of Land Management ("BLM").  71 Fed. Reg. 3158, 3160 (Jan. 19, 2006) (AR 79).  The other forty percent of the population lives on private and state lands.  71 Fed. Reg. at 76034 (AR 129).

According to the BLM, the Penstemon is in severe decline.  AR 941.  The Natural Heritage Programs for Utah and Colorado have identified the Penstemon as imperiled and at a high risk of extinction in both states.  71 Fed. Reg. at 76025 (AR 120).  All of the Penstemon populations have "low population numbers," and three of the five core populations have 200 or fewer plants.  *Id.* at 76034–35 (AR 129–130).  Because the Penstemon does not reproduce often and is adapted to a highly specialized oil shale soil habitat, it is vulnerable to habitat degradation, destruction, and fragmentation.  AR 2737, 2808, 2930–31.

### 3. Listing History

---

[3]  At the time of the Final Rule, occurrences of the Penstemon were grouped into five separate habitat units: (1) the Sand Wash Unit, which occurs in Uintah, Carbon, and Duchesne counties in Utah; (2) the Seep Ridge Unit, which occurs in Uintah county in Utah; (3) the Evacuation Creek Unit, which occurs in Uintah county in Utah and Rio Blanco county in Colorado; (4) the White River Unit, which occurs in Uintah county in Utah; and (5) the Raven Ridge Unit, which occurs in Rio Blanco County, Colorado.  AR 119–20; *see also,* AR 2526–31 (maps of each habitat unit).  These five habitat units are further divided into 109 "occurrences," or areas "with continuous suitable habitat with an extant or historical population" of the Penstemon. AR 119.

Petitions to list the Penstemon under the ESA have been submitted on three occasions. The first petition was in 1975 pursuant to ESA Section 12, which required the Secretary of the Smithsonian Institution to identify any plant species considered to be endangered or threatened. AR 077. The Smithsonian Institution's report, which identified several candidate species, including the Penstemon, was accepted by FWS as a petition to list the identified species on July 1, 1975 and FWS published a proposed rule to designate the Penstemon as endangered on June 16, 1976. AR 077–78. The ESA was amended in 1978, however, to require the withdrawal of all proposed rules pending for more than two years. AR 078. FWS withdrew the portion of the proposed rule that had not been finalized, including the proposed listing of the Penstemon, in accordance with the amendment. *Id.*

In 1990, FWS received a second petition from the Fund for Animals, which requested that the Penstemon be listed as threatened or endangered. *Id.* The FWS had previously assigned Category 1 status to the Penstemon, which meant that the FWS had sufficient information to support the preparation of a listing proposal. *Id.* On February 28, 1996, however, the FWS discontinued its use of category status designations, and the Penstemon was thereafter defined as an uncategorized candidate species. *Id.*

The third petition was submitted by Plaintiffs on October 8, 2002. *Id.* In subsequent litigation, the parties reached a settlement agreement that required the FWS to submit a proposed rule to list the Penstemon as a threatened species. AR 120. In accordance with the settlement, the FWS published the proposed rule to list Graham's penstemon as a threatened species and designate critical habitat on January

19, 2006 ("Proposed Rule").  50 Fed. Reg. at 3158 (AR 77).  According to the Proposed

Rule, "[h]abitat destruction and degradation as a consequence of energy development

throughout the species' range pose a serious threat to long-term viability."  *Id.* at 3164

(AR 83).  FWS identified direct and indirect adverse effects of energy development,

including the destruction of individual plants, destruction of occupied and potentially

suitable habitat, the spread of noxious and exotic weeds, decreased pollinator

biodiversity, and the loss of critical shale soils as a result of erosion.  *Id.* at 3163–64 (AR

82–83).  FWS also recognized that habitat loss and fragmentation from energy

development would "exacerbate threats arising from very low natural population

numbers and restricted distribution; natural phenomena such as drought and wildlife

grazing; livestock grazing; and horticultural collection."  *Id.* at 3164 (AR 83).

In accordance with its peer review policy, 59 Fed. Reg. 34270 (July 1, 1994),

FWS chose three independent experts with extensive knowledge of the Penstemon to

review the proposed rule.  71 Fed. Reg. at 76026 (AR 121).  All three peer reviewers

supported the proposal to list.  *Id.*  Other scientists who have studied the Penstemon in

the field also supported listing.  *See* AR 2743, 2765, 2804, 2808, 2930–31.

At the time that the Proposed Rule was issued, FWS recognized that the species

had the "strong potential to become an endangered species in the foreseeable future if

present threats increase and projected energy development scenarios, especially oil

shale and tar sand, occur."  AR 083.  The FWS therefore stated that its "final rule will

more closely evaluate the technologies and economic certainty of oil shale and tar sand

development . . . and its potential to threaten [the species]."  AR 077 & 083.  The FWS

cautioned that it "d[id] not have information specific to ongoing or proposed

[conventional oil and gas] actions" in the Penstemon's habitat.  AR 077.  FWS solicited comments from "the public, other concerned governmental agencies, the scientific community, industry, or any other interested party," concerning threat-related information.  *Id.*  In response, FWS received written comments from several entities. AR 121.

In particular, the BLM, which manages the public lands upon which sixty percent of the Penstemon occurs (AR 119), submitted "substantial information concerning: current and projected energy development; grazing use and management; off-road vehicle use and management; exotic species (weeds) control activities; wildland fire control actions; and the potential for horticultural collection."  AR 120.  BLM also provided information concerning the "planning and regulatory direction it will use to ensure the conservation of the species as a consequence of any future development of oil shale or tar sands that may affect the species."  AR 121.

On December 19, 2006, the FWS published its Final Rule withdrawing the Proposed Rule, thereby removing the Penstemon from candidate species status under the ESA.  AR 118–30.  In relevant part, the FWS concluded that "listing is not warranted because threats to the species as identified in [the Proposed Rule] are not significant." AR 119.  Specifically, the FWS determined that the "available data do not indicate that the threats to the species and its habitat, as analyzed under the five listing factors described in section 4(a)(1) of the [ESA], are likely to threaten or endanger the species in the foreseeable future throughout all or a significant portion of its range."  *Id.*

Plaintiffs timely commenced this action.  Following the filing of the record, the Defendants moved to strike various declarations and documents which were not a part

of the original record.  ECF No. 33.  By order dated May 20, 2010, the motion was

granted in part and denied in part.  ECF No. 46.  The motion was granted to strike

certain declarations as immaterial and redundant and various post-rule comments as

immaterial.  *Id*. at 5.  The motion was denied without prejudice as to the requested

judicial notice of 72 Fed. Reg. 53211 and 53215 concerning another species, the

Pariette cactus.

## **DISCUSSION**

1. Judicial Notice.

Before directly addressing the asserted violations of the ESA in FWS's Final

Rule, I must decide whether to take judicial notice of the extra-record decisions

concerning a different species, the Pariette cactus, found in 72 Fed. Reg. 53211 and

53215, an issue left unresolved by my May 20, 2010 order (ECF No. 46).  In 2007 the

FWS listed this cactus–which also exists only in small, isolated populations on oil

shale–as endangered because conservation measures could not avoid the adverse

effect of loss and fragmentation of habitat.  Plaintiff argues that this determination, even

though subsequent to the Penstemon Final Rule, is directly relevant because both plant

species exist in the same area and are subject to the same adverse impacts.  *See* 44

U.S.C. § 1507 (mandating judicial notice of the Federal Register); *United States v.*

*Kaufman*, 638 F.2d 192, 194 (10th Cir. 1980) (judicial notice should be taken of relevant

contents of Federal Register); *Pueblo of Sandia v. United States*, 50 F.3d 856, 861 n. 6

(10th Cir. 1995) (court may take judicial notice of post-decision document).  Defendant

objects, noting that FWS referred to the same habitat fragmentation studies in both

proceedings and simply came to different conclusions because of the different nature of

the species within the habitat.  Defendant points out that there are significant

differences in populations and affected acreages.  The cactus is limited to one

population in an area of 50 square miles while the Penstemon occurs in five distinct

small habitat units scattered across an area of 480 square miles.  Significant oil and gas

development has already occurred in the cactus habitat while the oil and gas

development in the Penstemon habitat is limited.  I agree with the Defendant that

relevancy is at best attenuated given the clear difference in species and their respective

location.  Without consideration of the cactus evidence I am concluding that the final

rule violates the ESA.  To infer some sort of confirmation of a similar decision on a

different species in the same general location is not only not necessary but also does

not make the existence of any fact of consequence more probable than it would be

without the evidence.  Fed. R. Evid. 401.  If there is some marginal relevance there is

great risk of confusing the issues without the opportunity of the parties to create a

record of the similarity or dissimilarity of the distinct species' existence in the same

general habitat and I conclude that any such probative value is substantially outweighed

pursuant to Fed. R. Evid. 403.  Therefore, I decline to take judicial notice of the Pariette

cactus evidence.

    2.  <u>Consideration of the Combined Effect of Mandated Factors.</u>

    Plaintiffs' principal challenge is that, even if the FWS considered each of the five

statutorily mandated factors set forth in 16 U.S.C. § 1533(a)(1) on an individual basis, it

failed to consider the cumulative or combined impact of all of the factors as required by

50 C.F.R. 424.11(c):

    (c) A species shall be listed or reclassified if the Secretary determines,

on the basis of the best scientific and commercial data available after conducting a review of the species's status, that the species is endangered or threatened because of any one or <u>a combination of the following factors</u>:

> (1) The present or threatened destruction, modification, or curtailment of its habitat or range;
> (2) Over utilization for commercial, recreational, scientific, or educational purposes;
> (3) Disease or predation;
> (4) The inadequacy of existing regulatory mechanisms; or
> (5) Other natural or manmade factors affecting its continued existence.  (Emphasis added.)

This language makes plain that individual consideration of each of the five factors does not suffice as the FWS must also consider the impact upon the species of all the factors together.  *Carlton v. Babbitt*, 900 F. Supp. 526, 530 (D.D.C. 1995) ("FWS must consider each of the listing factors singularly and in combination with the other factors"); *Wildearth Guardians v. Salazar*, 741 F.Supp 2d 89, 102 (D.D.C. 2010) ("FWS's failure to consider the cumulative effect of the listing factors renders the Finding arbitrary and capricious."). The FWS conceded this legal standard in oral argument.  Tr., ECF No. 49, p. 42 ("Defendants do not dispute that the listing factors in section 4 of the ESA must be considered individually and in combination.").

Review of the Final Rule discloses that FWS specifically addresses each of the five factors listed in the statute and regulation.  *See* 71 Fed. Reg. 76032-35.  The Final Rule, however, is devoid of any discussion of the effect of combining two or more factors.  Viewing each factor in isolation, FWS recognized the potential difficulties such as grazing, habitat fragmentation, exotic weeds, oil and gas development and other matters but concluded that each factor alone is "not currently a threat to the species, nor is it likely to become a significant threat in the foreseeable future."  *See* conclusions

13

under paragraphs A, B, C, D and E, 71 Fed. Reg. 76034-5.  However, nowhere does FWS consider the factors in combination rather than with isolated singularity and thus FWS has failed to make a determination mandated by 50 C.F.R. 424.11(c).

FWS seeks to dismiss this absence with the argument that in administrative review I should "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-86 (1974).  However, I find no marker disclosing that FWS ever struck upon a path of considering factors in combination.  Indeed, the Tenth Circuit has held that the "grounds upon which the agency acted must be clearly disclosed in . . . the record.  The agency must make plain its course of inquiry, its analysis and its reasoning." *Olenhouse*, 42 F.3d at 1575.  The record contains no such "path" or "course" of making a determination of the combined impact of the stated factors.

FWS also argues that since the Final Rule determined that no particular factor posed a threat by itself a combination would likewise not cause a threat.  *See* FWS's proposed order concluding that "requiring the Service to publish a detailed analysis for every conceivable coupling of one null factor with another null factor would be an exercise in futility . . ."  ECF No. 52-2 at 27.  Such reasoning disregards the reality that small, non-threatening injuries can incrementally lead to a fatal result, whether it is the "straw that broke the camel's back" or "death by a thousand cuts."  In any case, the Final Rule does not express any such reasoning and its argument now is merely an after-the-fact rationalization which does not cure its noncompliance.  *Olenhouse*, 42 F.3d at 1575; *Bowman*, 419 U.S. at 285-286 (a court "may not apply a reasoned basis for the agency's action that the agency itself has not given.").

14

I conclude that the FWS's failure to consider the combined or cumulative impact of the factors makes the final rule arbitrary and capricious. *See Wildearth Guardians*, 741 F.Supp. 2d at 102.

3.  Disregard of Best Available Scientific and Commercial Information.

Listing determinations under the ESA must be based solely on "the best scientific and commercial data available . . ." 16 U.S.C. 1533(b)(1)(A). The failure to do so means the agency's determination is arbitrary and capricious in violation of the ESA and APA. *Ctr. for Biological Diversity v. Morganweck*, 351 F. Supp. 2d 1137,1142 (D.Colo. 2004). Plaintiffs assert that was FWS's course of conduct, particularly with regard to the threat of conventional and oil share oil and gas exploration, grazing and ORVs. I address each in sequence.

a.  Threat of Oil and Gas Development, Including Oil Shale.

Plaintiffs challenge FWS's conclusion that energy development, including traditional oil and gas exploration as well as oil shale and tar sand development, do not constitute a current threat to the Penstemon species or that the development is not "likely to become a significant threat in the foreseeable future." 71 Fed. Reg. 76033. Plaintiffs claim FWS can reach that conclusion only by ignoring the best available scientific and commercial information in violation of the ESA.

Remembering that FWS had previously found that energy development was a significant threat which made the listing of Penstemon a high priority in 2004, 69 Fed. Reg. at 24882-83 (AR 62-63) and 2005, 70 Fed. Reg. 24920-21 (AR 70-71) and that the 2006 proposed rule concluded that energy development was a serious threat, 71 Fed. Reg. 3164 (AR 83), it is difficult to reconcile this record with the Final Rule's conclusion

15

of no foreseeable threat.  No explanation is given for why these previously perceived threats had been significantly eliminated.

Further, the Final Rule does not adequately address the many concerns raised by the BLM, even though the BLM ultimately did not recommend a listing.  *See* Clark May 10, 2006 letter.  AR 2818-19.  For example, in 2005, the BLM predicted that within the Vernal, Utah planning area where four Penstemon populations exist, there was "reasonable foreseeable development" of up to 6300 new wells within 20 years.  AR 886.  Further, projections in five different areas, some of which had Penstemon populations, involved over 3200 wells.  *See* AR 2839-40.  Although it acknowledges that essentially all of the Penstemon range is exposed to this likely energy development, 71 Fed. Reg. at 76033, the Final Rule does not discuss or address in any detail its impact. This failure is inconsistent with the ESA which requires that foreseeable threats to a species proposed for listing be considered.  *See* 16 U.S.C. § 1532(20) (defining threatened species as those likely to become endangered within the "forseeable future"); and § 1533 (a)(1)(A) (requiring evaluation of present and threatened destruction of habitat).  Without some discussion about the threat of future development, I cannot conclude that FWS engaged in the consideration mandated by the ESA.

In its briefing and proposed order, FWS does not really deny the absence of discussion of future threats of energy development and instead engages in *post-hoc* arguments such as the proximity of Penstemon habitat to energy development or the argument that the Penstemon live primarily on steep slopes.  Again, these rationalizations are not found in the Final Rule and I should not consider them.  *See*

16

*Olenhouse*, 42 F.3d at 1575.

I conclude that the FWS failed to consider the best information available concerning the impact of energy development presently and in the future, either individually or in combination with other possible factors.

b.  Threat of Grazing.

Plaintiffs object to FWS's conclusion that it had "no information indicating that grazing impacts threaten the continued existence of the species throughout all or a significant portion of its range."  Final Rule, 71 Fed. Reg. at 76033 (AR at 128). Plaintiffs assert that FWS ignored record evidence of the grazing threat, meaning that FWS failed to rely on the "best available science" as required by 16 U.S.C. § 1533(b)(1)(A).

FWS does acknowledge that grazing may have "localized effects," even citing an example where "heavy sheep grazing and trampling" is thought to have caused localized "extirpation" but noted that no research had been conducted on the effects of grazing on the Penstemon.  71 Fed. Reg. 76033.

Plaintiffs claim that in reaching these conclusions the FWS ignored a record from the BLM that all five colonies are subjected to cattle and/or sheep grazing, causing "a substantial grazing impact."  AR 945-6.  Plaintiffs also refer to the report of the consulting botanist/ecologist, Janet J. Cole, concerning her observations of the grazing impact in Colorado but not Utah.[4]  She observed that there was "abundant evidence that foliage and especially flowers are browsed by native ungulates, rabbits, insects and

---

[4]Cole did recommend listing the species as threatened.

17

domestic sheep."  AR 2737. Her sense was that livestock grazing was additional stress

"for a species already grappling with a stressful environment."  *Id.*  FWS dismissed this

record as being anecdotal, not the best scientific evidence.  As Plaintiffs respond,

however, it may well be that such evidence is the "best scientific data available."

Presumably everyone would agree that a full-scale study of the species in its

environment is preferred "but in the absence of such a study, credible anecdotal

evidence represents the 'best scientific . . . data <u>available</u>' and cannot be ignored."

*Northwest Ecosystem Alliance v. United States Fish & Wildlife Serv.,* 475 F.3d 1136,

1147 (9th Cir. 2007) (emphasis in the original).

      The Final Rule does not indicate that this anecdotal evidence and observations

were taken into account.  Clearly the Final Rule did not consider the impact of grazing

and trampling in combination with the other factors as mandated by law.  Upon remand,

FWS must consider the impact of grazing not merely in isolation as it did in the Final

Rule but in combination with other factors impacting the Penstemon populations.[5]

      c.  <u>Threat of ORV Use</u>.

      Plaintiffs challenge the Final Rule's findings that there has been little ORV use in

the Penstemon range and that it lacks "any information indicating that ORV use is a

threat . . ." 71 Fed. Reg. 76034.  Plaintiffs points to examples in the record of both ORV

use and its threat to the Penstemon habitat.  All areas are open to ORV use and spring,

when the plant is most vulnerable, is a popular time for ORVs.  AR 2861.  The BLM

---

[5]In its briefing and argument, FWS refers to BLM mitigation measures to help protect
the Penstemon from grazing.  There is no evidence, however, that FWS relied on the
BLM grazing mitigation measures as part of its decision and I should not consider such
post-hoc arguments.  *See Olenhouse*, 42 F.3d at 1575.

noted that there had been a significant increase in ORV use with a concomitant increase in soil erosion. AR 447, 621. BLM found that ORV use disturbs the Penstemon habitat, enables illegal collection of plants and indirectly contributes to the spread of noxious weeds. AR 960.

This record indicates that information was available but not addressed or considered by FWS as the Final Rule essentially ignores this data which is inconsistent with its duty to consider the best evidence available. *Heartwood, Inc. v. United States Forest Service*, 380 F.3d 428, 436 (8th Cir. 2004); *Morgenweck,* 351 F.Supp. 2d at 1142. And, again, the FWS did not consider the impact of ORV use in combination with other possible factors. Upon remand, FWS must consider the impact of ORV use in isolation and in combination with other factors impacting the Penstemon population.

4. <u>Conservation Measures.</u>

Plaintiffs' final challenge is to the FWS's reliance on conservation measures in the Final Rule to mitigage or avoid threats to the species. As noted, one of the listing factors to be considered is the adequacy of "*existing* regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D) (emphasis added). This plain language precludes the use of future conservation efforts in making the listing determination. *Morgenweck*, 351 F.Supp. 2d at 1141. If that is precisely what FWS did in relying on draft plans by the BLM for the Vernal, Utah area which anticipated future land use planning, AF 128-129, as well as future leasing for oil shale. *See, e.g.,* AR 128 (future conservation measures "are intended to eliminate significant potential threats to [the Penstemon] . . . *when and if they are issued.*") (emphasis added). Such reliance on possible future measures is unauthorized by statute or regulation and violates the ESA.

19

FWS also relied on supposed existing lease provisions to protect the Penstemon from energy development but provides no detail on how such protection is accomplished.  There is no discussion of what existing lease terms will mitigate the impact on the species.  The absence of detail about lease provisions precludes a meaningful determination of whether such provisions adequately protect the species.  As Plaintiffs point out (Plaintiffs' Reply Brief, pp. 29-30), there exists a wide range of surface and other protections contained in leases, from no disturbance of the surface to full recognition of the mineral interest as the dominant state.  Absent detail on the applicable lease terms it is not possible to determine the effectiveness protecting the threatened species.  This failure to consider the effectiveness of the conservation efforts on the basis of record evidence means that FWS failed to meet its statutory mandate.  *See Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1146 (9th Cir. 2001) (conservation agreement among agencies which did not provide "site-specific" detail how measures would protect habitat was insufficient); *Oregon Natural Res. Council v. Daley*, 6 F.Supp.2d 1139, 1159 (D. Or. 1998) (listing decision must determine effectiveness of conservation measures); *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 678, 684 (D.D.C. 1997) (mere assertion that protections exist without analysis insufficient to determine whether mechanisms effectively protect species).  *Western Watersheds Project v. Uited States Fish & Wildlife Serv.,* 535 F. Supp. 2d 1173 (D. Idaho 2007), provides some more particularlized guidance.  Also a case of energy development, the FWS acknowledged that it did not have detail about lease stipulations to protect the sage grouse or even the practices adopted by the BLM to improve sage grouse habitat.  *Id.* at 1187.  Nevertheless, even without this information the decision was made not to list the

20

grouse, apparently based upon assumption that conservation efforts would be effective. The court concluded: "The FWS's failure to coherently consider the adequacy of existing regulatory mechanisms renders its decision arbitrary and capricious." *Id.* at 1187.  I reach the same conclusion here.[6]

CONCLUSION AND RELIEF

For the reasons stated I conclude that FWS violated the ESA in withdrawing the proposed rule to list Graham's penstemon by failing to consider the threats in combination, ignoring or disregarding the best available scientific and commercial information, and relying on undetermined or unspecified conservation measures which were not implemented or established to be effective.  Accordingly, Plaintiffs' petition is granted to the following extent.  Pursuant to the APA, 5 U.S.C. § 706, the December 19, 2006 Final Rule is vacated and the proposed rule is reinstated.  The matter is remanded to the FWS for further consideration, with all deliberate speed, of a new Final Rule with respect to whether Graham's penstemon should be listed as threatened under the Endangered Species Act.

DATED at Denver, Colorado, on June 9, 2011.

BY THE COURT:

s/ Walker D. Miller
United States District Judge

---

[6]Plaintiffs also point out that, regardless of the effectiveness of the conservation measures, the BLM leases apply to only sixty percent of the habitat with forty percent found on private and state lands.  FWS failed to assess the threats to those lands.
.